Michael **BERRIGAN**, Richard Burrow, Harvey Fischler and Richard Randall, Plaintiffs, Appellants,

v.

**GREYHOUND LINES, INC.** and Amalgamated Council of Greyhound Local Unions, Defendants, Appellees.

No. 85–1443.

United States Court of Appeals, First Circuit.

Argued Oct. 9, 1985.

Decided Jan. 28, 1986.

Kathryn M. Noonan, with whom McDonald and Noonan, were on brief for plaintiffs, appellants.

David E. Watson, with whom Eric I. Lisman, Nutter, McClennen & Fish, were on brief for Greyhound Lines, Inc., defendants, appellees.

I.J. Gromfine, Gromfine, Sternstein, Rosen and Taylor, P.C., Arthur Flamm, Flamm & Birmingham, were on brief for Amalgamated Council of Greyhound Local Unions, defendants, appellees.

Before COFFIN and BREYER, Circuit Judges, HILL *, Senior District Judge.

COFFIN, Circuit Judge.

This is an appeal from a summary judgment dismissing plaintiffs' complaint against Greyhound Lines, Inc. (Greyhound) for breach of a bargaining agreement and against the Amalgamated Council of Greyhound Local Unions (Council) for breach of its duty of fair representation. Section 301 of the Labor Management Relations Act, 29 U.S.C. § 185. Plaintiffs are four Massachusetts teacher drivers. They protest Greyhound's elimination of its teacher driver program and the manner in which the Council processed employee objections to the termination. Plaintiffs particularly challenge the settlement reached between Greyhound and the Council prior to arbitration. The district court, after receiving extensive affidavits and other submissions beyond the pleadings, granted defendants' motions to dismiss. We affirm.

I

In 1957 Greyhound instituted a program under which public school teachers were hired as drivers during summer vacation. They were not subject, as were regular drivers, to the duty of responding to a recall for duty from September to June. In July of 1980 Greyhound, which previously had terminated teacher driver programs in some cities, decreed the elimination of the remaining programs, involving some 300 persons. It did allow the teachers the privilege of becoming regular drivers, but with a seniority dating from the time of transfer in 1980. This meant that a teacher would have to respond to call-ups for driving duty during the school year or forfeit his or her driving job. In fact some 70 teacher drivers were terminated. The remainder have stayed on, principally because their place on the seniority roster is so low that their recall to duty during the school year is not yet a problem.

Subsequent to the termination, a number of grievances were filed in various places. Some challenged Greyhound's right to terminate, while most of the grievances, including the one grievance filed by a plaintiff (Randall) in this action, sought to establish the original date of hiring as the basis for calculating seniority for purposes of vacation pay.[1]

---

* Of the Central District of California, sitting by designation.

1. Greyhound argues that because three of the four plaintiffs filed no grievance and because Randall's grievance was fully satisfied by the

All were submitted to the joint Greyhound-Council Contract Interpretation Committee, which met in September, 1980, the Committee heard certain teacher representatives, and, after the then Council President, Jones, allegedly said that he "hated school teachers" and saw nothing in the contract to require continuation of the teacher driver program, voted, 16 to 11, to support the drivers. After several discussions between the Council and Greyhound took place, without any resolution, arbitration was sought.[2] Discussions, however, continued and on June 16, 1982 a settlement agreement was signed.

The settlement provided that teacher drivers who elected to go full time with Greyhound would have their seniority for bidding purposes date from July 1, 1980, but their ranking among themselves would be based on their original date of application for employment. That original date also would govern vacation, sick leave, and pay progression. This effectively meant they received a retroactive pay increase for a period of almost two years (July 1, 1980 to June 16, 1982). All other grievances were "considered closed".

The lawsuit was filed nine days before the settlement, apparently after plaintiffs knew about it but before the agreement was signed. The complaint cited three articles of the collective bargaining agreement which Greyhound allegedly violated in terminating the teacher driver program and which violations the Council so inadequately dealt with as to breach its duty of fair representation. The first, Article A–2(k), captioned "Discipline", called for written notice of charges and discharge only for cause. The second, Article N–2, captioned "Beneficial Clause", prevents Greyhound from changing any "rule or regulation that beneficially affects the employees" unless the change is consented to or submitted to arbitration. The third, Article CNS–6, captioned "Seniority Establishment", provides that seniority rank of operators is determined by dates of graduation from Drivers' School except as otherwise set forth.

## II

■ Appellant's first argument is that the district court applied the wrong legal standard in assessing whether or not the Council breached its duty of fair representation. They seize upon the following passage of the court's opinion:

"[A] union is given great latitude to compromise competing interests among its members. *Humphrey v. Moore*, 375 U.S. 335, 349–50 [84 S.Ct. 363, 371–72, 11 L.Ed.2d 370] (1964). Thus, it is 'eminently reasonable' for a union to sacrifice the interests of some employees to serve those of others. *Baker v. Newspaper & Graphic Communications Union, Local 6*, 628 F.2d 156, 166 (D.C.Cir.1980)."

Appellants argue that this language shows that the court was following the slacker standard allegedly applicable only

settlement, an independent basis for supporting the judgment of the district court is lack of standing. In light of the view we take of the soundness of the district court's action in dismissing the complaint on the merits, to which all parties devote most of their argument, we do not address the standing issue.

**2.** In the meantime, plaintiffs' counsel had written Council President Hughes several letters (July 17, 1981; November 10, 1981; March 15, 1982) asking for details of the arbitration, volunteering to make available "certain information", and protesting a rumored possible settlement. Apparently the Council decided to ignore the first two letters.

Hughes's reply to the third letter was a full explanation of the Council's test for settling grievances ("only if we are satisfied that the settlement provides at least as much as we can reasonably expect to achieve on behalf of the grievant in an arbitration"), and its method of operation, viz., relying on the participation of knowledgeable officers and experienced counsel. Finding plaintiffs' counsel's charge of a failure to investigate documents and witnesses supporting the grievance "insulting", the reply closed by justifying the ignoring of the earlier letters "because your services are not required."

The substance, if not the tone, of the Council's reply might conceivably have had some effect on the plaintiffs' decision to pursue this case if it had not followed eight months of "stonewalling". The Council's attitude toward plaintiffs' counsel's offers of assistance, if fairly reflected by this record, seems calculated to stimulate unnecessary litigation.

when a union is charged with breaching its duty in *negotiating* a collective bargaining agreement. As to such cases it is appropriate to accord a union a "wide range of reasonableness" in trying to serve the interests of all its members. *Ford Motor Co. v. Huffman*, 345 U.S. 330, 338, 73 S.Ct. 681, 686, 97 L.Ed. 1048 (1953). In cases involving an alleged breach of duty in *administering* a collective bargaining agreement, however, appellants argue that the standard in *Vaca v. Sipes*, 386 U.S. 171, 190, 87 S.Ct. 903, 916, 17 L.Ed.2d 842 (1967) (union violates duty if its processing of a grievance is "arbitrary, discriminatory, or in bad faith") does not accord "a wide range of reasonableness" to the union's discretion. This argument is taken from a Seventh Circuit opinion, *Schultz v. Owens-Illinois, Inc.*, 696 F.2d 505, 514–15 (1982).

This argument cannot avail appellants here for several reasons. First, they overlook the concrete analysis pursued by the district court, involving considerations beyond the weighing of competing interests, and its conclusion, "I hold that plaintiffs have failed to allege that the Council's decision to settle was arbitrary or made in bad faith."

Second, we are not told how a different standard would have changed the decision below. We are told only that under a tougher standard, "an employee's interest under [an] agreement cannot so easily be traded off...." This illustrates the difficulty we have with any attempt to develop helpful bifurcated standards, and why it can be much more useful to look behind the standard to what was really at issue. In this case plaintiffs were entitled to representation not debilitated by hostility; to a bargaining agent in possession of all relevant facts and arguments; and to real, as opposed to perfunctory, efforts to protect their welfare. But they could not insist that their agent ignore the legitimate interests of all other members. In at least two ways the instant case involves a grievance (contract administration) in which there must be some balancing of interests. First, if the Council insisted on arbitrating on behalf of teacher drivers a case that it

felt had little basis in the contract, it arguably would jeopardize its credibility with the employer for purposes of later, more supportable, disputes with management policies, instituted on behalf of all members. Second, the interests of those teacher drivers who would be satisfied only by retention of the program had to be balanced with the interests of other teacher drivers whose major concern was seniority and who risked losing everything if the grievance went to arbitration.

In other words, if the *Schultz* doctrine of bifurcated standards were to be applied to this case, its very rationale suggests the looser standard. This is the kind of case Professors Harper and Lupu envisaged in their critique of "contractual rights norms":

> "Administration may well require a union to make distributional judgments as important as those made in the negotiating stage." Michael C. Harper and Ira C. Lupu, *Fair Representation as Equal Protection*, 98 Harv.L.Rev. 1211, 1260 (April 1985).

Finally, we are satisfied that the district court conducted its review consistently with the standards we have expressed or applied in *Sear v. Cadillac Automobile Co. of Boston*, 654 F.2d 4, 8 (1st Cir.1981) (union which failed to appeal arbitration decision does not breach duty "merely because ... it fails to espouse a position supported by some of ... its membership"); *Robbins v. George W. Prescott Publishing Co., Inc.*, 614 F.2d 3, 4 (1st Cir.1980) (allegation that union refused to invoke arbitration without giving reason does not meet plaintiff's burden); *Hayes v. New England Millwork*, 602 F.2d 15, 19 (1st Cir.1979) (simple allegation that union withdrew plaintiff's grievance from arbitration in absence of "allegation of bad faith, arbitrariness or discrimination by the union" or allegation "that the union ignored his grievance or 'processed the grievance in a perfunctory manner' (citation omitted)" was insufficient); *DeArroyo v. Sindicato de Trabajadores Packing, AFL–CIO*, 425

F.2d 281, 284 (1st Cir.1970) ("arbitrary and perfunctory handling ... is not acceptable").

Appellants' argument on the merits is that the undisputed facts show, or at least a genuine issue of fact exists as to (1) whether Council hostility infected the ultimate settlement, and (2) whether the Council's derelictions in investigating the grievances amount to arbitrary and perfunctory handling.

Appellants' duty, under *Hahn v. Sargent,* 523 F.2d 461, 464 (1st Cir.1975), is to create a "genuine issue" of material fact; genuineness requires " 'sufficient evidence ... to require a judge or jury to resolve the parties' differing versions'.... (citation omitted)." This duty requires considerably more than conclusions or a "skeletal set of bland allegations". *Dewey v. University of New Hampshire,* 694 F.2d 1, 4 (1st Cir. 1982); *Manego v. Cape Cod Five Cents Savings Bank,* 692 F.2d 174 (1st Cir.1982).

■ We first address the set of facts relevant to appellant's argument that the Council's settlement agreement was tainted by hostility to teachers. Jones's statement that he "hated school teachers", Hughes's reaction in his letter to plaintiffs' counsel that the letter's suggestions were "insulting", and the Council's refusal to contact teachers or to accept the assistance of plaintiffs' counsel are relied upon as sufficient to raise the issue. But despite Jones's outburst, the Council voted to process the grievances, and, in any event, he was no longer Council President nor a member of the Contract Interpretation Committee during the later processing and settlement. Nor is there any suggestion that he played any further role in the matter. The refusal to seek out teacher drivers and Hughes's characterization of certain suggestions as "insulting" do not help significantly in creating a genuine issue of hostility. Neither the statements nor the refusal to contact teachers or plaintiffs' attorney remotely suggest that the procedures resorted to differed from the Council's normal conduct and were "materially deficient". *Early v. Eastern Transfer,* 699 F.2d 552, 556 (1st Cir.1983).

■ If the second set of facts, those which would support a conclusion that the Council's handling and settling of the grievances were seriously defective, were more substantial, they might in turn add credibility to the hostility issue. But they, too, are gossamer. They consist of the allegedly inconsequential gain achieved in the settlement compared to the monumental loss of the teacher driver program and the lack of investigation of past benefits enjoyed by teacher drivers.

We begin by noting the contract clauses to which we have referred, breach of which was allegedly committed by Greyhound in terminating the teacher driver program. The Council was faced at the outset with the question whether termination of a program, which had been unilaterally first created by Greyhound and then had uneventfully been terminated in some areas, could be said to be disciplining an employee, changing a rule or regulation, or interfering with the principle of gearing seniority to graduation from Drivers' School. If not, there would never have been any basis on which arbitration could properly be sought. At the very least, the fact that the Council viewed its basic position as something less than the most compelling cannot be condemned as irrational.

In spite of any such assessment, the Council heard two teacher drivers present their case at the September, 1980, meeting, proceeded to negotiate with Greyhound, and secured seniority based on the original date of hire for vacations, sick leave, and pay progression. This accomplishment has been heavily discounted by appellants as a bagatelle compared to loss of the entire program, but such a conclusion would be proper only if it was demonstrably clear— which it was not—that an arbitrator would most probably have ruled that Greyhound could not terminate the teacher driver program.

Appellants further attack the compromise because of a lack of investigation. It is worth recalling that plaintiffs were only

four out of some 300 teacher drivers, that three filed no grievance at all, and that the grievance filed by the fourth was fully satisfied by the settlement. Moreover, the grievances filed were of two major types: a minority protesting elimination of the teacher driver program; and a majority directed at the vacation issue. Appellants' claim is that the Council was unfamiliar with the terms of employment of the teacher drivers and thus was in no position to refute Greyhound's erroneous view that they were terminated each season. But appellants have not even tried to show how such information could be relevant to the grievances protesting termination of the program—an issue of contract interpretation; as for the grievances relating to vacation, they were resolved in favor of the grievants.

What we said in *Early v. Eastern Transfer, supra,* 699 F.2d at 556, is pertinent here:

> "... the [appellants] did not specify in their affidavits any positive facts of significance which a more thorough investigation would have brought to light.... But in the absence of some specific indication of why further consultations were needed or how they could have helped, we can find no genuine issue concerning unfair representation due to inadequate investigation. *See Findley v. Jones Motor Freight, Inc.,* 639 F.2d 953, 959 (3d Cir.1981) (reversing jury's finding that union breached its duty)." 699 F.2d at 556.

■ One final issue is whether summary judgment should have issued before plaintiffs' interrogatories, seeking information about the extent of investigation of the grievances by the Council, were answered. Wholly apart from the conclusory nature of plaintiffs' argument that such information would be significant, appellants never sought to invoke Fed.R.Civ.P. 56(f). They did not file an affidavit to obtain a continuance to undertake needed discovery nor did they in any way indicate that lack of discovery was an issue. They cannot now raise it for the first time. *Johnston v.*

*Holiday Inns, Inc.,* 595 F.2d 890 (1st Cir. 1979). Because we find no genuine issue as to unfair representation, summary judgment also was appropriate in favor of the employer, Greyhound. *Vaca v. Sipes,* 386 U.S. 171, 187, 192–94, 87 S.Ct. 903, 915, 917–18, 17 L.Ed.2d 842 (1967).

*Affirmed.*