957 F.2d 933
 139 L.R.R.M. (BNA) 2679, 60 USLW 2620,
121 Lab.Cas. P 10,024
 Wilfredo COLON VELEZ, et al., Plaintiffs, Appellees,
v.
PUERTO RICO MARINE MANAGEMENT, INC., Defendant, Appellant.
Wilfredo COLON VELEZ, et al., Plaintiffs, Appellees,
v.
PUERTO RICO MARINE MANAGEMENT, INC., Defendant, Appellee,
International Longshoremen Association, Local 1575,
Defendant, Appellant.
 Nos. 91-1705, 91-1735.
 United States Court of Appeals,
First Circuit.
 Heard Jan. 9, 1992.
Decided Feb. 28, 1992.
 
 Rafael Cueves Kuinlam with whom Cuevas Kuinlam & Bermudez, Hato Rey, P.R., was on brief for Puerto Rico Marine Management, Inc.
 Nicholas Delgado Figueroa, Santurce, P.R., for International Longshoremen Ass'n, Local 1575.
 Ana Rosa Biascoechea, Hato Rey, P.R., for appellees.
 Before CYR, Circuit Judge, CAMPBELL and BOWNES, Senior Circuit Judges.
 BOWNES, Senior Circuit Judge.
 
 
 1
 This appeal stems from an action under section 301 of the Labor Management Relations Act, 1947 ("Act"), 29 U.S.C. § 185, that the plaintiffs-appellees, Wilfredo Colon Velez, et al., brought against the defendants-appellants, Puerto Rico Marine Management, Inc. ("PRMMI") for breach of a collective bargaining agreement and International Longshoremen Association, Local 1575 ("Local 1575") for breach of its duty of fair representation. The district court granted summary judgment in favor of the plaintiffs-appellees. 693 F.Supp. 1335. The major issue on this appeal is whether § 9(b)(3) of the Labor Management Relations Act--which prohibits the N.L.R.B. from certifying a bargaining unit including both guards and non-guards--entitles an employer to breach its voluntary collective bargaining agreement with such a unit, and a union to refrain from pressing the grievance of the guard members thereof. There are three other issues: 1) whether PRMMI and Local 1575 could exclude the appellees from the collective bargaining agreement; 2) whether Local 1575 breached its duty of fair representation to the appellees; and 3) whether pre-judgment interest was properly awarded and computed.
 
 BACKGROUND
 
 2
 As the appellants appeal a grant of summary judgment, we view the facts of the case and inferences to be drawn therefrom in the light most favorable to them. See Oliver v. Digital Equipment Corp., 846 F.2d 103, 105 (1st Cir.1988).
 
 
 3
 The appellees are twenty-eight gatemen/guards[1] who were employed by PRMMI since the beginning of its operation as administrator of the Puerto Rico Maritime Shipping Authority in 1974. At the time, Local 1575 served as the union representative for both the production and maintenance workers and for the guards as members of one bargaining unit at the "Load on-Load off" facilities in San Juan. PRMMI voluntarily recognized Local 1575 as the bargaining representative for such employees. PRMMI also employed guards who were not affiliated with Local 1575 at its Isla Grande facilities and subcontracted guard services to Wackenhut Corporation at both its Mayaguez and Ponce facilities.
 
 
 4
 In 1977 when negotiating a master contract with Local 1575, PRMMI proposed the elimination of employees who performed guard-type work from the bargaining unit. PRMMI eventually withdrew this proposal and included gatemen/guards at the "Roll on-Roll off" facilities in San Juan in the collective bargaining agreement. In March 1979, Local 1575 demanded the inclusion of all guards in the bargaining unit, including those at the Ponce facility. PRMMI agreed. During the negotiations for both the 1980-83 and 1983-86 collective bargaining agreements, PRMMI again proposed the elimination of guards from the bargaining unit. In reiterating its proposal in 1985, PRMMI gave as its reason rising insurance costs due to inadequate security services which had allegedly resulted in stolen property and vandalism. Local 1575 rejected the proposal at all times. The final collective bargaining agreement agreed upon by both Local 1575 and PRMMI included the guards and was effective until September 30, 1986.
 
 
 5
 The guards were all bona fide members of Local 1575. They paid union dues and received the full benefits of representation, including grievance processing. The relationship of the guards to Local 1575 did not change until February 12, 1986, when they were discharged by PRMMI. From 1974 to the date of the appellees' discharge, both PRMMI and Local 1575 knew that the appellees performed both gatemen and guard work and that the guard work predominated. During this period, PRMMI and Local 1575 entered into four collective bargaining agreements which contained identical clauses that: 1) required a "just and reasonable cause" standard for discipline, suspension, or discharge of employees; 2) established a seniority system; 3) prohibited PRMMI from subcontracting any work covered under the agreement unless it was negotiated by the parties and the subcontractor obliged itself to honor the contract; and 4) established a grievance procedure that culminated in binding arbitration to resolve "any incident, dispute, claim or controversy" between the parties over the interpretation and implementation of the agreement.
 
 
 6
 During Local 1575's participation in a seven-day national strike in October 1984, PRMMI hired additional security personnel. The appellees did not participate in the strike.[2]
 
 
 7
 In February 1985, PRMMI instructed the vice-president of security to solicit bids from private security firms for the subcontracting of guard services. On June 25, 1985, Local 1575 filed a complaint in federal district court requesting an injunction against the rumored subcontracting of guard services. In settling the case, PRMMI and Local 1575 entered into a stipulation in August 1985 defining the exact duties of the "gatemen." The parties agreed that "gatemen" were "to check the number of trailer vans that leave the premises to ensure they are correct according to a card, or to receive from the driver a pass, check the bills of lading, check the entrance and exit of cars."
 
 
 8
 On December 13, 1985, PRMMI contracted with Wackenhut Corporation for guard services to commence on February 3, 1986. The Wackenhut guards would perform substantially the same work as the discharged guards and were to be paid $6.20 per hour. In contrast, the discharged guards were paid over $16.00 per hour.
 
 
 9
 In January 1986, Local 1575 became aware of PRMMI's subcontracting plans and instructed the guards to form a new union comprised exclusively of guards and to petition the National Labor Relations Board ("Board") for certification. This was done. The Board dismissed the petition as moot after PRMMI discharged the appellees. On January 28, 1986, PRMMI formally notified Local 1575 that it was planning to subcontract out the guard services to Wackenhut. PRMMI indicated to Local 1575 that it would honor all obligations under the collective bargaining agreement with respect to gatemen.
 
 
 10
 On February 12, 1986, seven months prior to the expiration of the collective bargaining agreement, PRMMI summarily discharged sixty-two of sixty-five gatemen/guards, including the appellees, and replaced them with Wackenhut guards. On May 23, 1986, Local 1575 filed an unfair labor practice charge against PRMMI before the Board, alleging violations of § 8(a)(1) and 8(a)(5) under the Act by unilaterally subcontracting guard services. The Board refused to issue a complaint because it found that the "Union waived its right to negotiate said subcontracting of the gatemen work by failing to timely request bargaining over the decision."
 
 
 11
 In April and June 1986, Local 1575 requested job preference for the discharged guards in other unit classifications. Although PRMMI agreed to consider the request, an agreement was never formalized nor implemented.
 
 
 12
 In August 1986, the appellees brought a § 301 suit against PRMMI and Local 1575. They claimed that PRMMI breached the collective bargaining agreement when it discharged the appellees without submitting the issue for negotiation with Local 1575 and by ignoring the proper discharge procedure under the agreement. They claimed that Local 1575 breached its duty of fair representation by failing to protect their rights and press their grievances.
 
 
 13
 After several in-chambers conferences and pretrial discovery, the court set the trial date for January 23, 1987. The court continued the trial date to allow for further discovery and stipulations. Both parties submitted cross-motions for summary judgment. On July 15, 1988, the court granted the plaintiffs' motion for summary judgment. The court referred pending matters related to the issue of damages to a magistrate. The court adopted the magistrate's conclusions and recommendations and rendered judgment on May 31, 1990, which it subsequently amended on June 18, 1991. In its amended judgment, the court granted the plaintiffs damages, including lost wages and additional benefits, from their discharge date up to the termination of the collective bargaining agreement. The court apportioned damages between PRMMI and Local 1575. It also awarded the plaintiffs: 1) prejudgment interest of twelve percent computed from the date of the filing of the cause of action up to the date of the judgment; 2) costs; and 3) attorney fees.SECTION 9(b)(3)
 
 
 14
 The crux of both appeals centers on the statutory interpretation of § 9(b)(3). PRMMI and Local 1575 contend that their actions regarding the guards were reasonable and not in violation of any legal duties because, in essence, they had no legal responsibilities to protect the interests of the guards. They read § 9(b)(3) as excluding the guards from the protective realm of the collective bargaining agreement.
 
 
 15
 This case presents an issue of first impression for this circuit. We must determine whether § 9(b)(3) voids the provisions of an extant collective bargaining agreement with respect to guards affiliated with "a guard-nonguard union."[3]
 
 
 16
 Section 9(b)(3) prescribes in pertinent part:
 
 Determination of bargaining unit by Board
 
 17
 (b) The Board shall decide in each case whether, in order to assure to employees the fullest freedom in exercising the rights guaranteed by this subchapter, the unit appropriate for the purposes of collective bargaining shall be the employer unit, craft unit, plant unit, or subdivision thereof: Provided, That the Board shall not.... (3) decide that any unit is appropriate for such purposes if it includes, together with other employees, any individual employed as a guard to enforce against employees and other persons rules to protect property of the employer or to protect the safety of persons on the employer's premises; but no labor organization shall be certified as the representative of employees in a bargaining unit of guards if such organization admits to membership, or is affiliated directly or indirectly with an organization which admits to membership, employees other than guards.
 
 
 18
 (Emphasis added). Based upon the language of the above provision, the district court found:
 
 
 19
 By its terms, § 9(b) applies only to the NLRB, restricting the Board from using its processes to support a mixed unit.... This Court [ ] construes § 9(b)(3) as limitation only upon the NLRB, although presumedly a broad limitation that prohibits any act by the Board in support of a unit comprising both guards and production/maintenance employees. The statute does not operate to remove rights from guards who join mixed units. Therefore, if the plaintiffs in this case joined Local 1575, which was voluntarily recognized by PRMMI as the representative of the porteros as well as the production and maintenance employees, then the plaintiffs obtained full employee rights under the National Labor Relations Act.
 
 
 20
 (Citations and footnote omitted). We agree with the court's analysis.
 
 
 21
 The language of § 9(b)(3) deals exclusively with the parameters of Board functions. Section 9(b)(3) precludes the Board from 1) determining that a guard-nonguard unit is appropriate for collective bargaining purposes; and 2) certifying a union to represent a bargaining unit of guards if the union has non-guard members. The statute does not specifically prohibit guards from joining a guard-nonguard unit, prevent a union, including a guard-nonguard unit, and employer from voluntarily entering into a collective bargaining agreement, nor eliminate guards from the protection of the collective bargaining process.
 
 
 22
 We turn first to the legislative history of § 9(b)(3). Congress enacted § 9(b)(3) for the purpose of minimizing the danger of divided loyalty that arises when a guard is called upon to enforce the rules of his employer against a fellow union member. 93 Cong.Rec. 6444, reprinted in II NLRB, Legislative History of the Labor Management Relations Act, 1947, at 1541, 1581 (1948) ("Legislative History"). See also Drivers, Chauffeurs, Warehousemen & Helpers, etc. v. N.L.R.B., 553 F.2d 1368, 1373 (D.C.Cir.1977). The provision was the result of a congressional compromise. During the congressional debates, the House of Representatives wanted to exclude guards entirely from the protection of the Act. The Senate, however, insisted on including them. A compromise was struck resulting in the present language of § 9(b)(3). In summarizing the provision that was passed, Senator Taft explained:
 
 
 23
 Under the language of clause (3), guards still retain their rights as employees under the National Labor Relations Act, but the Board is instructed not to place them in the same bargaining unit with other employees, or to certify as bargaining representatives for the guards a union which admits other employees to membership or is affiliated directly or indirectly with labor organizations admitting employees other than guards to membership.
 
 
 24
 Legislative History, at 1541 (emphasis added).
 
 
 25
 The Board itself has interpreted § 9(b)(3) as limiting its role only.[4] In University of Chicago, 272 N.L.R.B. 873 (1984), the Board stated, "We have carefully considered the language and the history of Section 9(b)(3) and conclude that its purpose was to prevent a guard-nonguard union from participating in a Board-conducted election as either a petitioner or an intervenor." Id. at 874. This purpose is served by Board proscription from the certification process of guard-nonguard unions because it would "discourage representation by a single union of guards and nonguards and [ ] ensure that an employer is not compelled by Board action to bargain with such an organization." Id. at 875. The Board, therefore, emphasized the need to allow employers freedom from coercion in entering into collective bargaining with the union.
 
 
 26
 Courts have also construed § 9(b)(3) as limitations only on the Board. The Sixth Circuit in N.L.R.B. v. White Superior Division, White Motor Corp., 404 F.2d 1100 (1968), interpreted the legislative history of § 9(b)(3) to include guards within the protections of the Act.
 
 
 27
 If guard employees do join a union which also represents non-guards, their membership is not unlawful, and in fact an employer may, if it wishes, recognize such a union for purposes of collective bargaining.
 
 
 28
 Since membership by guard employees in a union which also represents non-guards is not unlawful, it would be an unfair labor practice for an employer to take discriminatory action against guard employees on account of such membership. That is not to say, however, that an employer may be compelled, directly or indirectly, to recognize such a union as bargaining agent for the guards.
 
 
 29
 Id. at 1103 (footnote omitted). See also N.L.R.B. v. Bel-Air Mart, Inc., 497 F.2d 322, 327 (4th Cir.1974) ("We conclude that the legislative history of sections 2(11) and 9(b)(3) leaves no doubt that guards are 'employees' within the meaning of section 2(3) and that they retain the full panoply of rights granted to non-guard employees by section 7. Section 9(b)(3) is a limitation not upon employee rights but upon Board powers.") In a similar case in the Western District of Pennsylvania, the Pennsylvania Labor Relations Board had excluded guards from a bargaining unit. Erie County Geriatric Center v. Local No. 2666, etc., 464 F.Supp. 561 (1978). The court held that the contract allowed the guards to receive benefits accrued because the employers had treated them as included in the bargaining agreement. Id. at 564.
 
 
 30
 The importance of Board certification is that it grants additional rights to unions, such as the right to have the Board process representation petitions or refusal-to-bargain complaints. Board certification serves to encourage membership in the certified union. In prohibiting Board certification, § 9(b)(3), rather than acting as a prohibition of membership in a guard-nonguard union, functions as a deterrent to such membership.
 
 
 31
 A second feature of this case supports our conclusion. In enacting § 9(b)(3), Congress was also concerned about possible coercion of the employers into collective bargaining agreements. Clearly, no employer can be compelled to recognize and bargain with a mixed guard unit. This concern, however, is not implicated when an employer voluntarily enters into an agreement, as is the case here.[5] The Board has stated:
 
 
 32
 Although the Board does not prohibit employers from voluntarily recognizing [guard-nonguard] labor organizations to represent units of guard employees, or even mixed units, we will not permit the Board's processes to be utilized in furtherance of that end.
 
 
 33
 Brink's, Inc., 272 N.L.R.B. 868, 870 (1985).
 
 
 34
 The collective bargaining agreement at issue had seven months of life left. Our examination of Board opinions shows that the Board has upheld the employers' withdrawal of recognition from the union on § 9(b)(3) grounds only in cases where the collective bargaining agreement had expired. Indeed, the Board has specified that it has not addressed the issue of § 9(b)(3)'s proscriptions to an extant contract. See, e.g., Brink's Inc., at 870 n. 7 ("[W]e note that in Wells Fargo Corp., 270 NLRB 787 fn. 4 (1984), we found it unnecessary to pass on whether a respondent would have been privileged to withdraw recognition within the contract term. We similarly find it unnecessary to pass on that issue in the instant case.")
 
 
 35
 The Second Circuit has explicitly ruled on this issue. In Truck Drivers Local Union No. 807 v. N.L.R.B., 755 F.2d 5 (2d Cir.), cert. denied, 474 U.S. 901, 106 S.Ct. 225, 88 L.Ed.2d 225 (1985), it held that an employer who voluntarily recognizes a guard-nonguard union may not discontinue the relationship during the existing contractual period. Id. at 10.
 
 
 36
 Both PRMMI and the union argue that the guards are not covered by the collective bargaining agreement because the guard-nonguard unit is not explicitly included in the agreement. The record establishes, however, that PRMMI voluntarily recognized appellees as members of Local 1575 and that both PRMMI and the union treated the guards as covered by the extant collective bargaining agreement. This de facto recognition by the employer and the union is sufficient.
 
 
 37
 We find that the guards were covered under the collective bargaining agreement up to its expiration.
 
 
 38
 AGREEMENT BY EMPLOYER & UNION TO EXCLUDE THE GUARDS
 
 
 39
 Local 1575 contends that the district court erred in determining that PRMMI and Local 1575 could not, during the term of the collective bargaining agreement, agree to clarify the bargaining unit and exclude the appellees from it. Local 1575 argues that clarification of a unit through stipulation is a routine matter. It fails, however, to cite to any supporting law for this proposition. Indeed, the law is to the contrary.
 
 
 40
 The Board in Wallace-Murray Corp., 192 N.L.R.B. 1090 (1971), refused to clarify a bargaining unit midway through a current bargaining agreement to exclude guards from it. See also N.L.R.B. v. Mississippi Power & Light Co., 769 F.2d 276 (5th Cir.1985); Consolidated Papers, Inc. v. N.L.R.B., 670 F.2d 754, 757 (7th Cir.1982); Shop Rite Foods, Inc., 247 N.L.R.B. No. 143 (1980); Massachusetts Teachers Ass'n, 236 N.L.R.B. 1427 (1978); Arthur C. Logan Memorial Hospital, 231 N.L.R.B. 778 (1977); Northwest Publications Inc., 200 N.L.R.B. 105 (1972). To allow such midterm petitions, the Board stated, would be disruptive of voluntarily continued bargaining relationships. Wallace-Murray, 192 N.L.R.B. 1090. Under the Wallace-Murray rule, the party seeking unit clarification must await the expiration of the current collective bargaining agreement and file another unit clarification petition with the Board. The underlying purpose of the rule has been to spare the parties unnecessary labor disputes, Shop Rite Foods, Inc., 247 N.L.R.B. No. 143, the wisdom of which the appellants have failed to follow.
 
 
 41
 We find that the stipulation into which Local 1575 and PRMMI entered was ineffectual with respect to removing the appellees from the protection of the collective bargaining agreement. Moreover, the continual recognition of the guards by the appellants for a period of almost six months after the stipulation was entered into contravened any effect the stipulation may have had.
 
 UNFAIR REPRESENTATION
 
 42
 Before we determine the issue of Local 1575's alleged breach of its duty of fair representation, we must address Local 1575's contention that it did not serve as the bargaining unit for the guards. Its main defense is that it was precluded by § 9(b)(3) from serving as the union representative for the guards. As already discussed, § 9(b)(3) imposes only restrictions on the Board from certifying Local 1575 as the representative of the guard-nonguard unit. Section 9(b)(3) does not prohibit Local 1575 from engaging in negotiations on behalf of the guards with PRMMI.
 
 
 43
 Local 1575 held itself out as the bargaining representative for both the guard and nonguard employees. It negotiated and entered into four collective bargaining agreements with PRMMI on the behalf of both guard and nonguard employees. Since at least 1974, it collected union dues from the guards who also participated in union elections. Local 1575 reaped the benefits of having sixty-five guards as members of its union. Up until August 1985, it fulfilled the obligations of the mutual pact into which it had entered with its guard members. With such a past history, Local 1575 cannot at the eleventh hour claim that it, in fact, was not the true union representative of the discharged guards.
 
 
 44
 We now turn to the issue of whether Local 1575 as the union representative of the discharged guards breached its duty of fair representation. A union breaches its duty of fair representation if its actions are either "arbitrary, discriminatory, or in bad faith." Vaca v. Sipes, 386 U.S. 171, 87 S.Ct. 903, 17 L.Ed.2d 842 (1967).
 
 
 45
 The Supreme Court in Air Line Pilots Assoc. Int'l v. O'Neill, --- U.S. ----, 111 S.Ct. 1127, 113 L.Ed.2d 51 (1991), has recently provided us with some guidance on what constitutes a breach of fair representation in the arena of negotiations. In examining the question of arbitrary union behavior, the Court held
 
 
 46
 that a union's actions are arbitrary only if, in light of the factual and legal landscape at the time of the union's actions, the union's behavior is so far outside a "wide range of reasonableness," Ford Motor Co. v. Huffman, 345 U.S. 330, 338, 73 S.Ct. 681, 686, 97 L.Ed. 1048 (1953), as to be irrational.
 
 
 47
 111 S.Ct. at 1130.
 
 
 48
 We have held that union members are "entitled to a bargaining agent in possession of all relevant facts and arguments; and to real, as opposed to perfunctory, efforts to protect their welfare." Berrigan v. Greyhound Lines, Inc., 782 F.2d 295, 298 (1st Cir.1986). This does not mean, however, that the union must "ignore the legitimate interests of all other members." Id. Rather, the union must engage in a balancing of interests. Id.
 
 
 49
 In the instant case, the district court found that Local 1575
 
 
 50
 took virtually no action with respect to the discharges of the plaintiffs or to the subsequent subcontracting. The Union's only effort on behalf of the plaintiffs began on May 23, 1986, when it filed NLRB Case No. 24-CA-5375, challenging the Wackenhut subcontract under § 8(a)(5).... The NLRB report [regarding Local 1575's filing of the complaint] concluded that "the Union failed to diligently pursue its bargaining rights by timely requesting bargaining." The Court concludes that the filing of NLRB Case No. 24-CA-5375 was at best a perfunctory effort to advance the interests of the guards.
 
 
 51
 In addition, the Court concludes that the Union took no other action in the interests of the plaintiffs.
 
 
 52
 The only defense that Local 1575 raises is the legal one premised upon § 9(b)(3)'s prohibitions, which we have dispatched. Further, there was no legal epiphany in 1985 regarding either Board or judicial interpretation of § 9(b)(3). Rather, the Board has consistently limited the application of § 9(b)(3) to Board powers and expired collective bargaining agreements. Local 1575 fails to explain why it continuously represented the guards from 1974 up to August 1985 if it believed that § 9(b)(3) precluded such representation. We cannot conclude that such behavior on the part of Local 1575 was reasonable as seen "in light of the factual and legal landscape." We hold that Local 1575 in taking mere perfunctory action to protect the jobs of its guard members violated its duty of fair representation.
 
 PRE-JUDGMENT INTEREST
 
 53
 PRMMI contends first that the district court erred in granting pre-judgment interest. In Red Star Express Lines v. International Brotherhood of Teamsters Local 170, 809 F.2d 103 (1st Cir.1987), we held that it was appropriate for the court in an action brought under the Act to grant pre-judgment interest. The court has proper discretion under its equitable powers to do so as long as the interest deals with tangible losses. Id. at 107. See also De Arroyo v. Sindicato de Trabajadores Packinghouse, 425 F.2d 281, 290 (1st Cir.), cert. denied, 400 U.S. 877, 91 S.Ct. 117, 27 L.Ed.2d 114 (1970). In the instant case, the district court granted pre-judgment interest on tangible losses--lost earnings. We conclude that the court did not err in granting pre-judgment interest.
 
 
 54
 PRMMI next contends that even if pre-judgment interest was proper in this case, the court erred in using Puerto Rico law to set a twelve percent interest rate. The court looked to Rule 44.3 of the Puerto Rico Rules of Civil Procedure[6] because it found that no federal statute existed fixing a pre-judgment interest rate. This is an issue of first impression for us. The federal statute 28 U.S.C. § 1961 provides a rate for post-judgment interest but is silent as to pre-judgment interest.
 
 
 55
 The Fifth Circuit has held that it is appropriate for the district court to look to state law for guidance in determining the rate of pre-judgment interest in an action brought under the Employee Retirement Income Security Act ("ERISA"). Hansen v. Continental Ins. Co., 940 F.2d 971 (5th Cir.1991). The court noted that as a general matter, where a cause of action arises out of a federal statute, federal law governs the scope of the remedy available to plaintiffs, including whether pre-judgment interest is to be allowed and at what rate. The court concluded, however, that because ERISA was silent on the issue of pre-judgment interest the district court properly looked to state law in setting the interest rate. Id. at 983-84. See also Sheet Metal Workers Int'l Assoc., Local Union No. 162 v. Jason Mfr. Inc., 694 F.Supp. 1476, 1478 (E.D.Cal.1987) (because no federal statute in labor dispute fixed the rate for pre-judgment interest, it is appropriate to turn to state law).
 
 
 56
 We agree with the reasoning of the Fifth Circuit. Because the Act is silent as to pre-judgment interest and the granting of pre-judgment interest falls under the equitable powers of the district court, the court may look to state law in setting the pre-judgment interest rate. We hold that the court did not abuse its discretion in levying pre-judgment interest against the appellants at a rate pursuant to Puerto Rico law.
 
 
 57
 We have considered all the other issues raised by the appellants and find them to be without merit.
 
 
 58
 Affirmed.
 
 
 
 [1]
 The appellees performed duties characteristic of both gatemen and guards. Local 1575 contends that the district court did not make the proper distinction between "gatemen" and "guards." We find otherwise. The district court used the Spanish word "porteros," which means gatemen, in referring to the employees who performed both guard and gatemen duties. This reference is understandable given the dualistic nature of the employment performed, gatemen and guard work. In its discussion of the facts and its application of the law, the court did not blur the distinction between the dual duties performed by plaintiffs
 
 
 [2]
 Local 1575 contends that during the October 1984 strike, the appellees refused to work as guards. Based on an affidavit of a PRMMI official, the district court, however, found that the appellees did not participate in the strike
 
 
 [3]
 We use the more accurate term "guard-nonguard union" instead of "mixed guard union" to describe a union, like Local 1575, that admits into membership and represents both guards and nonguards
 
 
 [4]
 We defer to the Board's interpretations and conclusions that are rationally based. N.L.R.B. v. Yeshiva University, 444 U.S. 672, 691, 100 S.Ct. 856, 867, 63 L.Ed.2d 115 (1980)
 
 
 [5]
 PRMMI contends that it was forced to recognize the bargaining unit under threat of a strike. The record, however, does not support this contention. Indeed, the record shows that the guards did not participate in the seven-day strike in 1984
 
 
 [6]
 "The court shall also impose on the party who has acted imprudently the payment of interest at the rate of twelve (12) percent per annum ... from the filing of the suit in all suits for damages, and up to the date [of judgment]...." P.R.Laws Ann. tit. 32, App. III, Rule 44.3(b) (1988 Supp.)