# United States Court of Appeals

## For the First Circuit

No. 09-2312

LUIS ALFREDO SANTIAGO-SEPÚLVEDA, ET AL.,

Plaintiffs, Appellants,

v.

ESSO STANDARD OIL COMPANY (PUERTO RICO), INC.;
TOTAL PETROLEUM PUERTO RICO CORPORATION,

Defendants, Appellees.

No. 09-2313

ENID MARGARITA FONSECA-MARRERO, ET AL.,

Plaintiffs, Appellants,

v.

ESSO STANDARD OIL COMPANY (PUERTO RICO), INC., ET AL.,

Defendants, Appellees.

No. 09-2330

HÉCTOR GIERBOLINI, ET AL.,

Plaintiffs, Appellants,

v.

ESSO STANDARD OIL COMPANY, ET AL.,

Defendants, Appellees.

APPEALS FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

[Hon. Justo Arenas, U.S. Magistrate Judge]

Before

Torruella, Boudin and Lipez,
Circuit Judges.

Juan H. Saavedra Castro with whom Manuel Correa Márquez, Xana Connelly, Correa, Collazo & Herrero, P.S.C., Carlos E. Montañez and Carlos E. Montañez Law Office were on brief for appellants.
Mark A. Klapow with whom Howrey LLP, Angel E. Rotger Sabat and Maymí, Rivera & Rotger, P.S.C. were on brief for appellee Esso Standard Oil Company (Puerto Rico).
Lee Sepulvado-Ramos with whom Lady Cumpiano, Albéniz Couret-Fuentes and Sepulvado & Maldonado, PSC were on brief for appellee Total Petroleum Puerto Rico Corporation.

April 26, 2011

**BOUDIN**, **Circuit Judge**.  Plaintiffs, who operated gas stations as franchisees of Esso Standard Oil Co. ("Esso") in Puerto Rico, sued Esso for alleged violations of Title I of the Petroleum Marketing Practices Act ("PMPA"), 15 U.S.C. §§ 2801-2807 (2006 & Supp. III 2010).  The magistrate judge, who presided at trial with the parties' consent, see 28 U.S.C. § 636(c)(1) (2006), denied plaintiffs' request for injunctive relief and damages, and plaintiffs now appeal.  The facts are largely undisputed.

Esso operated as a supplier of gasoline in Puerto Rico for over one hundred years; as of 2008, 161 stations sold Esso-brand gasoline in Puerto Rico.  These stations were operated by independent franchise dealers under agreements with Esso that authorized them to sell Esso's gasoline under Esso's trademark.  The franchise term was three years or longer for most plaintiffs, although some plaintiffs had one-year trial franchises.  In many cases, Esso also provided the stations.[1]

In late 2006, Esso--having suffered losses in the market for the five preceding years--began to consider leaving Puerto Rico.  After months of deliberation and negotiations, Esso decided in March 2008 to sell its operations and assets to Total Petroleum Puerto Rico Corp. ("Total"), a gasoline refiner and distributor

---

[1]About a third of the franchises owned their own land and stations outright, while two-thirds leased their stations from Esso as part of the franchise agreement.  This latter group leased the land and premises to Esso and Esso leased it back to them as part of the franchise agreement.

that at the time operated approximately ninety stations in Puerto Rico. On March 17, 2008, Esso notified its franchisees of its planned withdrawal from the Puerto Rican market, the sale of its assets to Total, and the termination of its relationship with its franchisees, effective September 30, 2008.

In late June and early July 2008, Total began to offer Esso's franchisees contracts to serve as franchisees of Total. Total uses a standard franchise model contract offered to potential new franchisees and to existing franchisees whose contracts are renewed. The standard contract is periodically updated, and had been updated in 2007 and 2008; Total offered the then-current standard contract to Esso franchisees.

In late August and early September 2008, five groups of Esso franchisees, unhappy with the terms Total offered in its franchise agreements, filed separate lawsuits in the federal district court in Puerto Rico against Esso. The complaints sought injunctive and declaratory relief under PMPA to prevent Esso from terminating its contracts with plaintiffs, as well as damages for Esso's alleged failure to comply with PMPA. Esso then pushed back the termination date of its contracts to the end of October 2008.

The district court consolidated the lawsuits and referred the cases to the chief magistrate judge, and the parties consented to a bench trial before the magistrate judge. Three days of hearings were held and ultimately the magistrate judge issued three

opinions.[2]  In the first, on October 18, 2008, he concluded that Esso had complied with PMPA and denied plaintiffs' request for injunctive relief.  Santiago-Sepúlveda I, 582 F. Supp. 2d at 185.

All but two of the plaintiffs eventually agreed to accept franchise agreements offered by Total.  In a second opinion, on June 23, 2009, the magistrate judge reaffirmed that Esso's actions had complied with PMPA, but, explaining that the question remained whether the individual contract terms in Total's franchise agreement complied with PMPA, he proceeded to find three specific terms illegal under local law but severable under the franchise contract's severability clause.  Santiago-Sepúlveda II, 634 F. Supp. 2d at 211-12.

Finally, on reconsideration, the magistrate judge issued his third opinion on July 30, 2009.  In it, he reaffirmed that the terms found illegal in the previous opinion were severable and held that two more terms were unenforceable under Puerto Rico law. Santiago-Sepúlveda III, 638 F. Supp. 2d at 200, 204-05.  He thereafter entered a final judgment in favor of Esso and Total (which had intervened to defend its franchise contract and its acquisition of Esso's properties).

_____

[2]Santiago-Sepúlveda v. Esso Standard Oil Co. (P.R.) (Santiago-Sepúlveda I), 582 F. Supp. 2d 154 (D.P.R. 2008), vacated in part, No. 08-1950, 2009 WL 87586 (D.P.R. Jan. 12, 2009); Santiago-Sepulveda v. Esso Standard Oil Co. (P.R.) (Santiago-Sepúlveda II), 634 F. Supp. 2d 201 (D.P.R. 2009); Santiago-Sepúlveda v. Esso Standard Oil Co. (P.R.) (Santiago-Sepúlveda III), 638 F. Supp. 2d 193 (D.P.R. 2009).

Appeals, by several contingents of plaintiffs, followed. We review factual findings made in the bench trial for clear error, Monahan v. Romney, 625 F.3d 42, 46 (1st Cir. 2010); denials of an injunction for abuse of discretion, García-Rubiera v. Calderón, 570 F.3d 443, 455-56 (1st Cir. 2009); and rulings on purely legal issues de novo, id. at 456. Because the framework for the judgment under review is provided by PMPA, the first step is to outline the relevant elements of the statute.

PMPA is a conventional dealer-protection statute limiting the circumstances in which a motor fuel franchisor can terminate or choose not to renew a franchise relationship. See Chestnut Hill Gulf, Inc. v. Cumberland Farms, Inc., 940 F.2d 744, 746 (1st Cir. 1991). This statute, like most others at both the federal and the state level, rests on the perceived "disparity of bargaining power between franchisor and franchisee," Veracka v. Shell Oil Co., 655 F.2d 445, 448 (1st Cir. 1981) (Breyer, J.), coupled with concerns said to be peculiar to franchising, Draeger Oil Co. v. Uno-Ven Co., 314 F.3d 299, 299 (7th Cir. 2002) (Posner, J.); see 123 Cong. Rec. 10,386 (1977) (statement of Rep. Mikva).

Under PMPA, a franchisor may terminate the relationship on any of five specified grounds, 15 U.S.C. § 2802(a), (b)(2)(A)-(E), and the one pertinent here--subsection (E)--permits termination if a franchisor determines

> in good faith and in the normal course of
> business to withdraw from the marketing of

-6-

motor fuel through retail outlets in the relevant geographic market area in which the marketing premises are located.

There are other restrictions and requirements, such as proper advance notice, id. §§ 2802(b)(1)(A), 2804(b)(2), but they are not at issue on this appeal.

However, for withdrawals under subsection (E), there are further conditions, 15 U.S.C. § 2802(b)(2)(E)(iii), specifying alternative means to preserve the franchisee's operations; the statutory alternative chosen by Esso here allowed it to sell the premises it leased to its dealers to another franchisor, so long as the purchasing franchisor-to-be

offers, in good faith, a franchise to the franchisee on terms and conditions which are not discriminatory to the franchisee as compared to franchises then currently being offered by such other person or franchises then in effect and with respect to which such other person is the franchisor.

Id. § 2802(b)(2)(E)(iii)(II). Whether this condition applies to all of the dealers in this case is an open question but, given our disposition, need not be resolved.[3]

---

[3]The condition applies only to franchisees that occupy "leased marketing premises," id. § 2802(b)(2)(E)(iii), and whether it applies to those who own their premises but engaged in a double lease arrangement (see note 1, above) is an open question. Compare id. § 2801(1)(B)(i), 2801(9), with Barman v. Union Oil Co. of Cal., 50 F. App'x 824, 829 (9th Cir. 2002) (unpublished). Further, by its terms section 2802(b)(2)(E) is limited to franchise terms that are three years or longer.

If a franchisor terminates the franchise relationship but fails to comply with these requirements, its franchisees can sue it for equitable relief, actual and exemplary damages, and attorney and expert witness fees. 15 U.S.C. § 2805(a), (b), (d). When the fact of termination is proved by the franchisee (and it is conceded here), the burden falls on the franchisor to establish "that such termination or nonrenewal was permitted" by PMPA. Id. § 2805(c).

Plaintiffs' first substantive contention is that Esso did not comply with section 2802(b)(2)(E)(iii)(II) because (allegedly) Total did not offer the former Esso dealers "franchise[s] . . . on terms and conditions which are not discriminatory to the franchisee as compared to franchises then currently being offered by [Total] or franchises then in effect and with respect to which [Total] is the franchisor." 15 U.S.C. § 2802(b)(2)(E)(iii)(II). In a nutshell, plaintiffs allege on appeal that different Esso franchisees were offered different contracts by Total.

For example, plaintiffs say that Total required some to operate a convenience store, while others were not required to do so, and those operating convenience stores also had to sign non-compete agreements, while others did not. They also allege that Total included a term in the franchise agreement--personal supervision by the franchisee--that would make those franchisees that operate multiple stations in default (an interpretation that Total's marketing director denied in his own testimony).

Although plaintiffs made a discrimination claim below, it was different from those urged on appeal. The argument made to the magistrate judge was that the franchises offered to them were different than the ones Total offered to its preexisting franchisees, not that the terms offered to former Esso dealers differed from each other. Absent plain error, which was not even asserted on this issue, a claim not presented in the lower court is not available on appeal. Bennett v. City of Holyoke, 362 F.3d 1, 6 (1st Cir. 2004); Beddall v. State St. Bank & Trust Co., 137 F.3d 12, 22 (1st Cir. 1998).

As it happens, "Congress did not intend 'not discriminatory' to mean that each service station operator must be offered a franchise with identical terms. A franchisor must be free to offer different terms at different franchise locations, depending on the economic conditions and forecast for that area." Ewing v. Amoco Oil Co., 823 F.2d 1432, 1438 (10th Cir. 1987). Thus, to employ additional terms for franchisees with convenience stores on the premises could well be legitimate so long as all of Total's franchisees in this situation were offered similar terms. But we need not pursue the subject.

Plaintiffs' next claim is that Total's offer of franchises was not "in good faith," as section 2802(b)(2)(E)(iii)(II) requires, because the magistrate judge found that some terms in the franchise contract violated state law and

struck the offending provisions. This claim raises questions not only as to the meaning of "good faith" in section 2802(b)(2)(E)(iii)(II), but also the relationship between this provision and other sections in PMPA that relate to the statute's interaction with state law. 15 U.S.C. §§ 2805(f)(1)(B), 2806(a).

"Good faith" usually refers to a subjective intent or motive that is legitimate rather than consciously evil or dishonest. Esso Standard Oil Co. (P.R.) v. Monroig-Zayas, 445 F.3d 13, 18 (1st Cir. 2006) (quoting Esso Standard Oil Co. v. Dep't of Consumer Affairs, 793 F.2d 431, 432 (1st Cir. 1986)) (construing section 2802(b)(3)(A)). But just what must be done in good faith by the new franchisor is less certain; and the phrase could be read merely to afford some protection to the new franchisor in making an offer that it honestly believed to be non-discriminatory.

Indeed, Congress emphasized that the good faith requirement aimed only to protect franchisees from "arbitrary or discriminatory" behavior, but otherwise to "avoid judicial scrutiny" of the reasoning behind the franchisor's business judgments. S. Rep. No. 95-731, at 37 (1978), reprinted in 1978 U.S.C.C.A.N. 873, 896. But the requirement could as easily be read instead, or as well, to afford further franchisee protection--pertinently, by disallowing an offer that might be non-discriminatory but was structured to be unacceptable and intended to provoke refusal.

-10-

A number of courts have construed the term in the latter sense, and while the issue has not been adequately briefed, we will assume for present purposes that such an offer would not be in good faith.[4] This might seem hard on the departing franchisor who alone can be sued under PMPA and may have no easy way to judge the subjective good faith of its successor; but the statute does aim to keep the former franchisees in business and the sale of a business involves various risks and there are various means for the seller to protect against them.

However, no evidence suggests that Total devised the franchise agreements in the hope that they would be rejected. The magistrate judge found several provisions of the franchise agreement unlawful under Puerto Rico law; but Total, even assuming it shared that view, could easily have believed that the agreements would be accepted by franchisees, old and new. The franchise agreement was Total's standard model for renewing franchises for its own dealers, and it was buying out Esso to expand its business.

---

[4]See, e.g., Unocal Corp. v. Kaabipour, 177 F.3d 755, 767 (9th Cir. 1999) (good faith requirement looks in part to whether terms are used "'as a pretext to avoid renewal'" (quoting Valentine v. Mobil Oil Corp., 789 F.2d 1388, 1392 (9th Cir. 1986))); May-Som Gulf, Inc. v. Chevron U.S.A., Inc., 869 F.2d 917, 927 (6th Cir. 1989) (incoming franchisor found to act in good faith where its actions demonstrated that it was "committed to timely renewal of the plaintiffs'" contracts, and there was no evidence that it, among other things, "drastically increased [the plaintiffs'] rents").

Indeed, the magistrate judge found no evidence indicating that "the Total franchise agreements [were intended] to force any franchisee to reject the proposal."  Santiago-Sepúlveda I, 582 F. Supp. 2d at 182.  And when the magistrate judge said that certain provisions were unenforceable and struck them, Total went along with the court and has not cross appealed.  So we see no basis for suggesting that Total intended that its offer be rejected, and plaintiffs point to nothing that would support such an inference.

Instead, plaintiffs argue that any term violating state law in any respect comprises a violation of section 2802(b)(2)(E)(iii)(II).  For this position they rely on a statement in a House Report that if

> a franchisor proposed a provision in a franchise agreement at the time of renewal which was expressly prohibited or unenforceable under State law, such change could not be considered to have been made in "good faith" within the meaning of 102(b)(3)(A) [15 U.S.C. § 2802(b)(3)(A)].

H.R. Rep. No. 103-737, at 5 (1994), reprinted in 1994 U.S.C.C.A.N. 2779, 2782-83.

This looks impressive until one learns that this language was addressed to (a) a proposed provision that was not adopted;[5] (b) an example discussing renewals under section 2802(b)(3)(A), and

---

[5]Compare H.R. Rep. No. 103-737, at 10 (1994), reprinted in 1994 U.S.C.C.A.N. at 2785, with 15 U.S.C. § 2806(a), and Petroleum Marketing Practices Act Amendments of 1994, Pub. L. No. 103-371, 108 Stat. 3484, 3485-86 (1994).

-12-

not to the incoming franchisor's duty to make a "good faith" offer of nondiscriminatory contracts to franchisees, H.R. Rep. No. 103-737, at 5 (1994), reprinted in 1994 U.S.C.C.A.N. at 2782; and (c) a specialized problem regarding preemption for which a different solution was found, id. at 4-5, reprinted in 1994 U.S.C.C.A.N. at 2782; 140 Cong. Rec. 27,316 (1994) (statement of Rep. Sharp).

Plaintiffs' per se rule would put at risk a vast number of market withdrawals. Franchising contracts commonly cover a wide range of subjects, including clauses "pertaining to nearly every detail of operation" of the franchised business. Hadfield, Problematic Relations: Franchising and the Law of Incomplete Contracts, 42 Stan. L. Rev. 927, 943 (1990). Total's franchise agreement, comprising interrelated contracts spanning about one hundred pages, included hundreds of clauses--of which the magistrate judge invalidated in part just five.

Congress did make clear that, save where PMPA regulates termination and renewal and so bars inconsistent state law, state law is not superceded, 15 U.S.C. § 2806(a), and it provided that a franchisor could not require as a condition of entering into or renewing a franchise a "release or waive[r]" of a federal right or "any right that the franchisee may have under any valid and applicable State law," id. § 2805(f). But the primary effect of these reservations is to leave franchisees free to bring private

suits in state court to invalidate franchise provisions that are inconsistent with state law.

> As the Supreme Court recently explained:
>
> > In enacting the PMPA, Congress did not regulate every aspect of the petroleum franchise relationship but instead federalized only the two parts of that relationship with which it was most concerned: the circumstances in which franchisors may terminate a franchise or decline to renew a franchise relationship. Congress left undisturbed state-law regulation of other types of disputes between petroleum franchisors and franchisees.

Mac's Shell Serv., Inc. v. Shell Oil Prods. Co., 130 S. Ct. 1251, 1259 (2010) (citations omitted). Nothing in PMPA purports to create a separate federal cause of action to remedy such violations; the civil remedy provisions of section 2805 are explicitly limited to violations of three other specified sections including section 2802. 15 U.S.C. § 2805(a), (b), (d); Dersch Energies, Inc. v. Shell Oil Co., 314 F.3d 846, 857 (7th Cir. 2002).

This does not fully answer the question whether a state law violation could ever serve to defeat a good faith offer under section 2802(b)(2)(E)(iii)(II); but it suggests that the "good faith" test is not failed merely because a couple of terms in a complex contract are at odds with state contract or franchise law, itself often no model of clarity.[6] Violations so harmful to the

---

[6]Mac's Shell pointed out that construing the PMPA to cover "'run-of-the-mill' franchise disputes" would have "serious implications" and, because PMPA requires attorney and expert witness fees and permits punitive damages,"turn everyday contract disputes into high-stakes affairs." 130 S. Ct. at 1260 n.7.

core franchise bargain as to invite rejection might be evidence of an intent to cause rejection; but nothing like that is present here.

Plaintiffs next argue that the entire franchise contract is invalid under state law, and so Total never in fact made an "offer[]" of "a franchise to the franchisee[s]" under section 2802(b)(2)(E)(iii)(II). The underlying argument is that the contract could not be saved by deleting specific clauses because those provisions were not severable from the contract and so the entire contract is invalid. However, the contracts include a "Severance of Clauses" provision that reads in pertinent part as follows:

> [S]hould any provision in this Contract be found to be unlawful, invalid, or unenforceable under present or future laws, said provisions shall be nullified; this Contract shall be interpreted and governed as if said unlawful, invalid or unenforceable provision had never been a part thereof, and the rest of the provisions in this Contract shall remain in force and will not be affected by the unlawful, invalid or unenforceable provision or its elimination.

The franchise agreements are largely governed by Puerto Rico law and such severance is permissible under Puerto Rico law. E.g., McCrillis v. Autoridad de las Navieras de P.R., 23 P.R. Offic. Trans. 109, 132-33 (P.R. 1989) ("[T]he parties, by mutual agreement, stipulated the partial conservation of the contract. There is no protected social interest that bars this solution." (footnote omitted)). Nor, as plaintiffs' mistakenly claim, is

-15-

severance equivalent to "reformation," 27 R. Lord, <u>Williston on Contracts</u> § 70:19 (4th ed. 2003), so the conditions for reformation are beside the point.

Plaintiffs also say that any terms inconsistent with Puerto Rico law amount to a required waiver or release of state law rights forbidden by section 2805(f)(1) and that, as they have not been paid separately for such a waiver or release, the contract fails for want of consideration. Congress was apparently willing to allow such waivers or releases if compensated, H.R. Rep. No. 103-737, at 6 (1994), <u>reprinted in</u> 1994 U.S.C.C.A.N. at 2782; S. Rep. No. 103-387, at 4 (1994), but the terms found invalid were voided by the magistrate judge and so could hardly justify compensation.

As the last of their substantive claims, plaintiffs say that the magistrate judge should have invalidated, under 15 U.S.C. § 2805(f)(1), still other provisions of the contract as violations of state law--for example, a non-compete clause relating to convenience store operations. No request for their invalidation was made until plaintiffs' reply brief and so they are barred on this appeal, <u>Rivera-Muriente</u> v. <u>Agosto-Alicea</u>, 959 F.2d 349, 354 (1st Cir. 1992), but plaintiffs may pursue whatever remedies they retain under state law.

Plaintiffs also make a single procedural claim, namely, that the magistrate judge misstated the burden of proof at several

points in his decision. The statute, as already noted, says that the plaintiff must show termination and the defendant must then show that the conditions permitting termination were met. 15 U.S.C. § 2805(c). The magistrate judge's statements are arguably inconsistent with one another, recognizing at one point that the burden was on the defendant and at other points suggesting that plaintiffs had failed to offer evidence on specific issues.

Confusion can easily occur because a defendant often cannot know what the objection is until one is identified by the plaintiff, and a lack of evidence from the party not bearing the burden of proof can bear on whether there is an issue to be resolved. In all events, the preserved arguments that we have considered do not turn on who bears the burden of proof, and there is no indication that the magistrate judge's statements affected the outcome. See In re LaFata, 483 F.3d 13, 23 (1st Cir. 2007).

Finally, plaintiffs seek damages and attorney fees. Under 15 U.S.C. § 2805(d)(1), these are allowed to plaintiffs who prove a violation of sections 2802, 2803 or 2807, but, as we explained above, plaintiffs failed to prove any such violation. Although the magistrate judge sided with plaintiffs on their section 2805(f) claims, PMPA--which provides no express remedies to plaintiffs for such violations, id. § 2805(a), (d)--assuredly does not provide damages or fees for state law violations standing

alone, so the magistrate judge correctly refused to award damages or fees.

The judgment of the court below is <u>affirmed</u>.  Each side will bear its own costs on this appeal.

<u>It is so ordered</u>.