# United States Court of Appeals
## For the First Circuit

Nos. 09-1439, 09-1956

TMTV, CORP.,

Plaintiff, Appellee/Cross-Appellant,

v.

MASS PRODUCTIONS, INC.; EMMANUEL LOGROÑO, a/k/a Sunshine Logroño; GILDA SANTINI; CONJUGAL PARTNERSHIP LOGROÑO-SANTINI,

Defendants, Appellants/Cross-Appellees.

APPEALS FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

[Hon. Raymond L. Acosta, U.S. District Judge]

Before
Boudin, Circuit Judge,
Souter,* Associate Justice,
and Selya, Circuit Judge.

María D. Trelles-Hernández and Néstor M. Méndez-Gómez with whom Pietrantoni Mendez & Alvarez LLP, John F. Nevares and John F. Nevares and Associates PSC were on brief for defendants, appellants/cross-appellees.
Roberto Sueiro-Del Valle with whom Roberto Sueiro Del Valle Law Offices, Freddie Oscar Torres-Gomez and Law Office of Roberto Sueiro were on brief for plaintiff, appellee/cross-appellant.

June 13, 2011

---

*The Hon. David H. Souter, Associate Justice (Ret.) of the Supreme Court of the United States, sitting by designation.

**BOUDIN, <u>Circuit Judge</u>**.  Before us are cross-appeals in a decade-long copyright dispute concerning two sitcoms on Puerto Rican television.  On one side is TMTV, Corp., a successor in interest to the first sitcom's production company; on the other, the second sitcom's production company, Mass Productions, Inc., and its principals--including the star of both shows, Emmanuel "Sunshine" Logroño.  The district court granted summary judgment to TMTV on its claim charging infringement; and a jury granted it substantial damages, which the district court reduced by an amount recovered by TMTV in settlement of related litigation.

A summary of events and prior proceedings will suffice.  In 1997, Antonio Mojena--an established television producer in Puerto Rico--approached two veteran entertainers--Sunshine Logroño and Iris Chacón--about co-hosting a variety show on Puerto Rican television.  The show would be called <u>De Noche con Iris y Sunshine</u> and would begin with four two-hour episodes, continuing thereafter if it proved popular.  Chacón and Logroño both agreed to participate.

During Mojena's initial pitch, he and Logroño discussed filling some of the two-hour episodes of <u>De Noche con Iris y Sunshine</u> with comedy segments.  To that end, Logroño arranged a meeting in late September or early October 1997 with a team of comedians and scriptwriters, including scriptwriters Roberto Jiménez and Miguel Morales; Jiménez had worked with Logroño before,

while Morales had not.  At the meeting Jiménez suggested a sitcom centered on a condominium building and its residents.  Logroño approved of the idea of setting a comedy segment in a condominium building, and the title 20 Pisos de Historia ("20 Pisos") was chosen.

The session produced a number of suggestions for dramatis personae, many modeled on preexisting characters taken from other projects involving the team.  For example, a focus of the sitcom was to be a gossipy security guard in the lobby named "Vázquez," who was based on a character Logroño played in a comedy segment in a previous television special, Sunshine a la BBQ.  "Soto," an older woman living alone, was drawn from a character in another prior Logroño show, La Tripletta.  These and like adaptations were used when the sitcom was aired.

After this discussion of ideas, Logroño asked Morales to write scripts for two of the first three episodes of 20 Pisos and Jiménez to write the third.  Logroño's recollection was that he framed the plots of all three, and Morales and Jiménez merely prepared dialogue to conform to Logroño's storylines. By contrast, Morales claims that he wrote the two scripts at home, by himself, based on the general concepts aired at the meeting; similarly, Jiménez claims to have taken the general ideas from the session and fixed them in writing for the first time.

The writers delivered their scripts to Logroño, who retyped all three using special screen-writing software. On the cover pages, Logroño listed Morales as the author of episodes one and three and Jiménez as the author of episode two. Logroño claims to have made substantial changes in the scripts given to him, but the trail of drafts shows only minimal editing. And while Logroño appears to have co-written a number of later scripts for 20 Pisos, these reflected themes and characters set up in the first three episodes.

The first episode of 20 Pisos aired on the inaugural broadcast of the variety show, De Noche con Iris y Sunshine, on November 7, 1997. The show was produced by Creative Relief Corp.-- a business wholly owned by Mojena--and broadcast in Puerto Rico by the WKAQ television station, an affiliate of the Telemundo network. The early episodes were successful and the variety show--and the 20 Pisos sitcom within it--became a recurring weekly program for almost two years (although renamed after Chacón left).

In December 1999, Logroño decamped from WKAQ for a rival television station--WAPA, an affiliate of Televicentro--where he starred in a new sitcom produced by Mass Productions (a company controlled by Logroño and his wife), titled El Condominio. The new show, which began airing on WAPA in March 2000, featured many of the same actors as 20 Pisos. The show retained the old characters and the sitcom unfolded in a virtually identical condominium

-4-

setting, although new stories were developed and some new characters added.

On March 15, 2000, TMTV brought a copyright infringement action in federal district court against Logroño, his wife, and their production company, Mass Productions.[1]  The suit sought a declaratory judgment and various other legal and equitable remedies.  Logroño filed an answer and counterclaim, asserting that he was the sole owner of the copyright to the outlines, scripts, and characters used for 20 Pisos and that he was owed royalty payments for the use of these properties by TMTV.

In due course, the district court granted summary judgment in the plaintiff's favor.  TMTV, Corp. v. Mass Prods., Inc. (TMTV I), 345 F. Supp. 2d 196 (D.P.R. 2004).  The court held that Morales and Jiménez had authored the first three scripts of 20 Pisos pursuant to valid work-for-hire agreements with TMTV's predecessor in interest and that all later episodes of 20 Pisos were derivative of the first three.  Id. at 204-08.  As to infringement, the district court found 20 Pisos and El Condominio virtually identical.  Id. at 213.

In December 2004, a month or so after this decision, Televicentro--the network on which El Condominio was broadcast--

---

[1]TMTV is wholly owned by Mojena, who formed it from a predecessor entity in January 1999.  In February 1999, Creative Relief--the initial production company for De Noche con Iris y Sunshine--assigned its putative copyrights to TMTV.

sought unsuccessfully to intervene and to have the partial summary judgment set aside. In August 2005, TMTV sought to consolidate its own suit with two others now pending before another district judge: an infringement suit by TMTV against Televicentro for broadcasting El Condominio and a suit against TMTV by a group of actors claiming copyright in the characters they had portrayed in 20 Pisos. This motion too was denied.

Thereafter, Logroño made his own failed attempt to undo the liability ruling against the defendants by claiming that the scriptwriters' work-for-hire agreements with TMTV were invalid. TMTV, Corp. v. Mass Prods., Inc. (TMTV II), 453 F. Supp. 2d 378, 382-83 (D.P.R. 2006). He also sought, unsuccessfully, to forestall a trial on damages by arguing that a private intervening settlement of the suit by TMTV against Televicentro meant that any further award to TMTV would be an impermissible double recovery.

Prior to the trial, TMTV elected to claim only its actual damages (and not the defendants' profits or statutory damages). See 17 U.S.C. § 504 (2006). TMTV's expert witness, economist Michael Einhorn, estimated damages as at least $4.9 million, based on licensing fees TMTV allegedly would have earned but for the infringement by the defendants; this was measured in part by licensing fees actually earned by another comparable sitcom on Puerto Rican television. The jury awarded TMTV $772,079.29.

Following the verdict, the district court, over TMTV's objection, reduced the award by $700,000, representing the amount that TMTV had received in settlement from Televicentro. The court awarded TMTV prejudgment interest at the local-court rate of 5 percent per annum on the original jury verdict up through the date of the Televicentro settlement and, from then on, on the much smaller balance. Finally, the court denied TMTV's request for attorneys' fees as barred by the registration requirement of the Copyright Act, 17 U.S.C. § 412.

Both parties filed timely appeals, and we begin with Logroño's challenges to the summary judgment--most importantly, his attack on the infringement ruling against him and his co-defendants. That ruling in turn required that TMTV show both ownership of a validly copyrighted work and improper copying of the protected elements of that work. Yankee Candle Co. v. Bridgewater Candle Co., 259 F.3d 25, 33 (1st Cir. 2001). Our review of the summary judgment ruling is de novo.

Since TMTV's claim to copyright runs through Jiménez and Morales, the first question is whether they or Logroño should be viewed as the creator of the original scripts. Jiménez and Morales say that once the condominium setting was agreed upon, they wrote the initial three scripts, framing the plots and dialogue and drawing in part on stock characters used in previous projects in

-7-

which the team had participated.  Logroño says that he outlined the plots and rewrote the scripts.

Ordinarily, a credibility contest means that the case must be tried but, in this instance, Logroño's claim to have substantially rewritten the scripts is refuted by comparing the originals and the final product.  As for Logroño's supposed outlining of the plots, he has pointed to no writing--neither any written outline by him nor any notes taken by anyone at the original meeting--that reflects anything like an outline of the scripts.  At best, Logroño's version would mean that he suggested some general ideas for plots and possible stock characters for the initial scripts.

One of the axiomatic requirements for copyright is that the author's work be "fixed."  17 U.S.C. § 102(a).  Copyright is a protection afforded to the definite expression of ideas but not the ideas themselves.  See, e.g., Cmty. for Creative Non-Violence v. Reid, 490 U.S. 730, 737 (1989); Erickson v. Trinity Theatre, Inc., 13 F.3d 1061, 1071 (7th Cir. 1994).  On this record, the district court properly found that there was no case on liability for a jury.  Scott v. Harris, 550 U.S. 372, 380 (2007).[2]

---

[2]Nimmer raises the possibility of joint authorship in a case where one party supplies the plot ideas and another writes them down, 1 M. Nimmer & D. Nimmer, Nimmer on Copyright § 6.07[A][3][a], at 6-21 (rev. ed. 2009); but it is not certain that this suggestion is consistent with authorities like Reid and anyway Logroño is not arguing that the parties aimed at joint authorship.

Logroño claims to have suggested the security guard and other characters; but nothing in the record indicates that they had the delineation needed to make them subject to copyright. Stock characters, like stock scènes à faire, are not subject to copyright protection. Nichols v. Universal Pictures Corp., 45 F.2d 119, 121 (2d Cir. 1930), cert. denied, 282 U.S. 902 (1931); 1 P. Goldstein, Goldstein on Copyright § 2.7.2, at 2:91-93 (3d ed. 2005); cf. Coquico, Inc. v. Rodríguez-Miranda, 562 F.3d 62, 68 (1st Cir. 2009). So even if Logroño suggested general plot ideas and stock characters, his claim to authorship of the scripts still fails.

Positing Jiménez and Morales as the authors, ownership must still be traced to TMTV. Although the copyright ordinarily vests in the initial author or authors, 17 U.S.C. § 201(a), TMTV claims that the three scripts fall within the work "made for hire" rubric, id. § 201(b), meaning that the original production company would be considered the author. The district court agreed and, the original production company having assigned its rights to TMTV, the court treated TMTV as the copyright owner. TMTV II, 453 F. Supp. 2d at 381-82; TMTV I, 345 F. Supp. 2d at 206-07.

Jiménez and Morales confirmed in depositions that this was their own oral understanding with the production company; but the statute requires express agreement in a signed written instrument, see 17 U.S.C. § 101 (definition); and the circuits are divided as to whether the language and policy require the writing

-9-

before the creation or at least the completion of the work.[3]  But even assuming that the rights remained with the scriptwriters, before this case began they conveyed (in writing, 17 U.S.C. § 204(a)) whatever rights they had to TMTV.  We may rely on this assignment even though the district court did not.  Torres v. E.I. Dupont de Nemours & Co., 219 F.3d 13, 18 (1st Cir. 2000).

Logroño next argues that he participated heavily in writing later scripts and that the district court's conclusion that these scripts were derivative works of the first three was cursory and unsupported.  See TMTV I, 345 F. Supp. 2d at 207-08.  But this was not his theory in the district court and so is forfeit, Santiago-Sepúlveda v. Esso Standard Oil Co. (P.R.), No. 09-2312, 2011 WL 1548933, *3 (1st Cir. Apr. 26, 2011); nor, given the full scale development of the show in the first three scripts, would this new take be persuasive.

The second element in the liability claim is infringement, which requires proof that actual copying occurred and that the copying was so extensive that the two works are "substantially similar."  Segrets, Inc. v. Gillman Knitwear Co.,

---

[3]Compare Schiller & Schmidt, Inc. v. Nordisco Corp., 969 F.2d 410, 413 (7th Cir. 1992) (written work-for-hire agreement must precede creation of work), and Gladwell Gov't Servs., Inc. v. Cnty. of Marin, 265 F. App'x 624, 626 (9th Cir. 2007) (same), with Playboy Enters., Inc. v. Dumas, 53 F.3d 549, 559 (2d Cir.) (written agreement might postdate creation if "memorializing" earlier oral agreement), cert. denied, 516 U.S. 1010 (1995).  See also 1 Nimmer & Nimmer, supra, § 5.03[B][2][b], at 5-56.

-10-

207 F.3d 56, 60 (1st Cir.), <u>cert. denied</u>, 531 U.S. 827 (2000). However, Logroño obviously had access to the original scripts and based <u>El Condominio</u> upon them, bringing with him a number of the actors. The initial episode of <u>El Condominio</u> mentioned the characters' move to a new building; and the <u>El Condominio</u> advertising campaign invited viewers to reconnect with their favorite characters at a new location.

So copying is not in doubt and the issue is substantial similarity, which requires comparing the <u>expressive</u> elements of the copyrighted work contributed by the author--the components alone subject to copyright protection--with those of the allegedly infringing work. <u>Yankee Candle</u>, 259 F.3d at 33. No infringement claim lies if the similarity between two works rests necessarily on non-copyrightable aspects of the original--for example, "the underlying ideas, or expressions that are not original with the plaintiff." <u>Matthews</u> v. <u>Freedman</u>, 157 F.3d 25, 27 (1st Cir. 1998); <u>accord</u> <u>Johnson</u> v. <u>Gordon</u>, 409 F.3d 12, 19 (1st Cir. 2005).

Infringement can occur where--without copying a single line--the later author borrows wholesale the entire backdrop, characters, inter-relationships, genre, and plot design of an earlier work.[4] Imagine, for example, that the first Sherlock

---

[4]Such an ensemble may be protected by copyright, when reduced to expression in a book or script, even though it may itself contain non-copyrightable elements, such as stock characters borrowed from prior works. <u>See, e.g.</u>, <u>Barris/Fraser Enters.</u> v. <u>Goodson-Todman Enters., Ltd.</u>, No. 86 Civ. 5037 (EW), 1988 WL 3013,

Holmes stories had been penned and copyrighted last year by Sir Arthur Conan Doyle, and Logroño had then written his own sequels carrying everything forward into a new plot. See, e.g., Anderson v. Stallone, No. 87-0592 WDKGX, 1989 WL 206431, at *8 (C.D. Cal. Apr. 25, 1989). Here, we agree with the district court that

> the similarities between the two programs are so striking that there is no doubt that "El Condominio" is . . . an unauthorized derivative work. In effect . . . both programs are the same with only a difference in name and transmitted via a different channel. Specifically, the setting, character names, costumes, character interactions, comedy line, mood, [and] camera angles are almost identical in both sitcoms.

TMTV I, 345 F. Supp. 2d at 213.

Logroño's claimed differences between the two shows are not significant. For example, although the action in El Condominio unfolds largely in a condominium building lobby virtually identical to the lobby setting in 20 Pisos, the second sitcom also added some scenes in a laundry room and the handyman's space; so, too, some characters are given more dialogue or minor variations in character traits (e.g., a new hearing problem). Such trivial modifications are not a defense. Cf. Coquico, 562 F.3d at 68; Matthews, 157 F.3d at 28.

---

at *5 (S.D.N.Y. Jan. 4, 1988) ("[E]ven though a television game show is made up entirely of stock devices, an original selection, organization, and presentation of such devices can nevertheless be protected, just as it is the original combination of words or notes that leads to a protectible book or song.").

-12-

Liability for copyright violation being established, we turn to damages. The jury awarded $772,079, but the district judge reduced this figure by $700,000 for the settlement payment TMTV received from Televicentro. Logroño argues that all of the damages awarded by the jury should have been erased by the settlement; TMTV, as cross-appellant, claims that none of the damages awarded by the jury should have been reduced by the settlement payment.

The acts of infringement by the defendants and by Televicentro are not identical but they are entangled: Logroño and his production company produced the infringing El Condominio programs and Televicentro broadcast them. In this case, TMTV's theory of damages at trial was that the infringement diverted from TMTV potential licensing royalties; this was patently a claim for plaintiff's damages rather than defendants' profits.[5]

We start with the defendants' claims. The defendants make two different arguments for their view that the prior TMTV-Televicentro settlement barred any recovery at trial. The first is that the settlement constituted a release of claims against any available party who could be charged with infringement based on the same episode; the second, that the judgment entered upon the

---

[5]The Copyright Act of 1976 allows a party who recovers its actual damages to recover any profits made by the infringers, at least to the extent that the infringers' profits are not already "taken into account in computing the actual damages." 17 U.S.C. § 504(b); see also 4 Nimmer & Nimmer, supra, § 14.01[A], at 14-7. TMTV agreed before trial to drop any claim it may have had to recover the defendants' profits.

settlement is <u>res judicata</u>, precluding any further claims against the defendants.

Older common law doctrine tended toward the view that a settlement with one tortfeasor extinguished claims against other joint tortfeasors responsible for the same harm--although who was a joint tortfeasor and what constituted the same harm could be fraught questions; but the modern view is strongly in favor of treating a settlement with one joint tortfeasor as releasing the others only if the parties to the settlement so intended; otherwise, the settlement becomes an offset against later judgments if needed to avoid double recovery.[6]

The TMTV-Televicentro settlement, as an agreement, is arguably interpreted under Puerto Rico law, <u>Great Clips, Inc.</u> v. <u>Hair Cuttery of Greater Bos., L.L.C.</u>, 591 F.3d 32, 35 (1st Cir. 2010), although federal law might be thought to bear on whether a federal judgment incorporating a settlement should reduce a later federal judgment on a federal claim, <u>Singer</u> v. <u>Olympia Brewing Co.</u>, 878 F.2d 596, 599-600 (2d Cir. 1989), <u>cert. denied</u>, 493 U.S. 1024 (1990). But the question of which law applies is academic here,

_____

[6]<u>See</u> <u>Zenith Radio Corp.</u> v. <u>Hazeltine Research, Inc.</u>, 401 U.S. 321, 343-47 (1971) (release); <u>McDermott, Inc.</u> v. <u>AmClyde</u>, 511 U.S. 202, 207-11 (1994) (credit for settlement). <u>See generally</u> <u>Restatement (Second) of Judgments</u> § 50 (1982); <u>Restatement (Second) of Torts</u> §§ 885-886 (1979); W. Keeton et al., <u>Prosser and Keeton on the Law of Torts</u> §§ 48-49, at 330-35 (5th ed. 1984).

because both Puerto Rico and federal law follow the modern approach in looking to the intent of those who made the settlement.[7]

The defendants claim that TMTV's acceptance of the settlement payment bespeaks an intent to relinquish claims against non-settling tortfeasors, absent an express reservation of rights. In some situations, a settlement with a joint tortfeasor might suggest such an intent, see Keeton, supra, § 49, at 335--for example, a release discharging "any and all persons" potentially liable on the stated claims. But the opposite is often more plausible: frequently, the plaintiff gives a break to the first settling defendant, puts some money in the bank, and aims for a higher judgment against non-settling defendants. If the release were for all, a larger settlement would be demanded.

Here, the settlement itself was apparently oral and TMTV denies any such intent to release others besides Televicentro. The defendants--on whom the burden of proof falls to prove release, Fed. R. Civ. P. 8(c)--point to nothing to suggest that Televicentro had such an intent. Indeed, the defendants do not even suggest a

---

[7]Compare BUC Int'l Corp. v. Int'l Yacht Council Ltd., 517 F.3d 1271, 1276-79 (11th Cir. 2008), and Screen Gems-Columbia Music, Inc. v. Metlis & Lebow Corp., 453 F.2d 552, 554 & n.2 (2d Cir. 1972), with Vernet v. Serrano-Torres, 566 F.3d 254, 260-61 (1st Cir. 2009) (citing Merle v. West Bend Co., 97 P.R. Dec. 403 (1969)), Río Mar Assocs., LP v. UHS of P.R., Inc., 522 F.3d 159, 164-67 (1st Cir. 2008) (citing Szendrey v. Hospicare, 158 P.R. Dec. 648 (2003)), and Ortiz v. Banco Popular de P.R., 934 F. Supp. 29, 32 (D.P.R. 1996) (citing Merle, 97 P.R. Dec. 403).

plausible reason why Televicentro should have wished to pay a larger settlement in order to protect the defendants in this case.

Turning then to the <u>judgment</u> entered pursuant to the Televicentro settlement, it says that the $700,000 payment is made "in satisfaction of all causes of action identified in the Complaint [against Televicentro] and its amendments." The claims in that complaint identified acts by Televicentro, including the broadcast of episodes of <u>El Condominio</u>, as alleged violations of TMTV's copyright based on the original scripts; but the complaint asserted no claims against the present defendants based on their production of the shows.

A judgment has the meaning (objectively determined) intended by the court that framed and entered it, <u>cf.</u> <u>Concilio de Salud Integral de Loíza, Inc.</u> v. <u>Perez-Perdomo</u>, 625 F.3d 15, 19-20 (1st Cir. 2010); but where the judgment is based on a settlement, courts may look to the intent of the settling parties, 18A C. Wright, A. Miller & E. Cooper, <u>Federal Practice and Procedure</u> § 4443, at 262 (2d ed. 2002); <u>cf.</u> <u>Hermes Automation Tech., Inc.</u> v. <u>Hyundai Elecs. Indus. Co.</u>, 915 F.2d 739, 751 n.10 (1st Cir. 1990). Here, nothing shows that either the judge who entered the prior judgment or the parties to that case intended to release anyone else.

The result is the same if the settlement aspect is ignored and formal res judicata rules are applied to the judgment.

-16-

Because no issues were adjudicated in the settled case, issue preclusion is irrelevant and the concern is only with claim preclusion. Classically, claim preclusion applies only where there is (1) a prior final judgment on the merits (2) on the same or sufficiently identical claims (3) between the same parties or their privies. Airframe Sys., Inc. v. Raytheon Co., 601 F.3d 9, 14 (1st Cir. 2010).

Whether or not the defendants are treated as joint tortfeasors, they were not parties to the settled case and are not in privity with Televicentro. See Taylor v. Sturgell, 553 U.S. 880, 894 (2008). Claim preclusion extends beyond parties and their privies only in unusual circumstances;[8] consider, for example, a plaintiff, unsuccessful against an initial defendant, seeking to litigate identical claims against new but closely related defendants. Negrón-Fuentes v. UPS Supply Chain Solutions, 532 F.3d 1, 10 (1st Cir. 2008).

Eliminating entirely the party or privy condition would require that whenever a plaintiff sued a defendant, the plaintiff also sue in the same action all other defendants against whom the plaintiff might have related claims. No such compulsory joinder requirement appears in the Federal Rules of Civil Procedure or

---

[8]See FleetBoston Fin. Corp. v. Alt, 638 F.3d 70, 80-81 (1st Cir. 2011); Airframe Sys., 601 F.3d at 17-18; In re El San Juan Hotel Corp., 841 F.2d 6, 10-11 (1st Cir. 1988); see also Gambocz v. Yelencsics, 468 F.2d 837, 842 (3d Cir. 1972).

elsewhere.  Cf. Restatement (Second) of Judgments, supra, § 49.  If such a rule were ever adopted--and this itself would be a debatable choice--fairness would require advance warning to potential plaintiffs and probably major qualifications on the requirement itself.

As for TMTV's objection to the offset, the modern view, as already stated, is that an offset is conventional where needed to prevent recovering twice for the same harm.  There are other solutions apart from a dollar-for-dollar reduction of the judgment by the amount of the settlement, including a more complex proportional regime that the Supreme Court has employed in admiralty cases.  See McDermott, 511 U.S. at 211-17; cf. Río Mar Assocs., 522 F.3d at 166-67 (Puerto Rico law).  But neither side argues here that some other method should be used.

Rather, TMTV's claim is that the reduction is not warranted because (it asserts) the settlement was for a different harm, in that Logroño prepared a derivative work, 17 U.S.C. § 106(2), while Televicentro publicly transmitted it, id. § 106(4).  True, some of the infringing acts differed: Logroño acted and wrote scripts; the television company broadcast the programs.  But the damages were (on TMTV's own theory) the same harm: the lost royalties that could have been earned by TMTV for the production and broadcast of the El Condominio programs if TMTV's right had

been respected instead of infringed.  Production and broadcast were two necessary, sequential steps needed to cause the same damage.

TMTV also says that the Televicentro settlement was for Televicentro's profits rather than TMTV's damages.  Although damage liability is joint and several, Screen Gems, 453 F.2d at 554, liability for profits is several only, MCA, Inc. v. Wilson, 677 F.2d 180, 186 (2d Cir. 1981).[9]  But nothing supports TMTV's claim that the Televicentro settlement was, sub silentio, restitution of profits but not compensation of actual damages.  Indeed, the damage expert in both cases was the same.  In sum, the district court's treatment of the settlement was correct.

The defendants argue lastly that the district court erred in its award of prejudgment interest (5 percent on the full jury damage award up to settlement and thereafter only on the balance). The defendants say that the Copyright Act does not authorize the award of prejudgment interest and that, if the statute does permit such an award, the equities do not favor an award here or at least the award should have been made at a lower rate of interest.

The Copyright Act does not expressly authorize prejudgment interest but authority for such an award can be inferred, where appropriate, from congressional purpose and general

---

[9]While separate profits of two infringers might well be recovered without duplication, a copyright plaintiff may recover actual damages and the infringers' profits only to the extent that profits are not subsumed in actual damages.  17 U.S.C. § 504(b).

-19-

principles. <u>Rodgers</u> v. <u>United States</u>, 332 U.S. 371, 373 (1947).
Here, as actual damages were calculated, TMTV was deprived of
royalties that would have been due had the defendants produced the
infringing programs under license. Prejudgment interest dating
from the infringements compensated the plaintiff for the time value
of monies it should have had--just as if a contract debt had not
been paid on time.

Conversely, the defendants had the use of additional
funds--whatever portion of their assets corresponded to such
royalties--during the period before the judgment, so an award of
prejudgment interest also avoids unjust enrichment. <u>Cf.</u> <u>Frank</u>
<u>Music Corp.</u> v. <u>Metro-Goldwyn-Mayer Inc.</u>, 886 F.2d 1545, 1552 (9th
Cir. 1989), <u>cert. denied</u>, 494 U.S. 1017 (1990). Because the
Televicentro settlement provided TMTV with most of the deficiency
from that time forward, the defendants' interest obligations on the
reduced balance give them a slight windfall--although not at TMTV's
expense.

Our own case law treats an award of prejudgment interest
in such cases as a matter for the informed discretion of the
district court. <u>See</u> <u>John G. Danielson, Inc.</u> v. <u>Winchester-Conant</u>
<u>Props., Inc.</u>, 322 F.3d 26, 51 (1st Cir. 2003).[10] Given the range

_____

[10]The case law in other circuits is too various to summarize,
but broadly speaking a number of circuits support prejudgment
interest awards for copyright infringement; and circuit cases where
such awards have been disallowed do not in general apply a
categorical ban. <u>Compare, e.g.,</u> <u>McRoberts Software, Inc.</u> v. <u>Media</u>

-20-

of circumstances and the mix of motives for such awards, this flexibility may make sense. Certainly on the present facts there was no abuse of discretion in making the award or in limiting it in the fashion adopted by the district judge.

For post-judgment interest on federal judgments, a uniform federal rate applies by statute, 28 U.S.C. § 1961 (2006) (weekly average yield of one-year constant maturity treasury bills), but no default federal rate exists for prejudgment interest; here, the district judge applied the prevailing rate of 5 percent used in Puerto Rico courts for both pre- and post-judgment interest. P.R. Laws Ann. tit. 32, App. III, R. 44.3 (2000). The federal post-judgment section 1961 interest rate would have been approximately 0.5 percent when judgment was entered in January 2009.

The defendants claim that it was obligatory or at least more equitable to use the lower federal rate even though it is designed for post-judgment interest. The considerations are somewhat different where, absent a stay or bond, the successful plaintiff can effectively require prompt payment, see Fed. R. Civ. P. 64(b), and the present federal rate is depressed by current monetary policy designed to combat recession. The choice of the

---

100, Inc., 329 F.3d 557, 572-73 (7th Cir. 2003) (upholding award), with Robert R. Jones Assocs., Inc. v. Nino Homes, 858 F.2d 274, 277, 282 (6th Cir. 1988) (vacating award). See generally 4 Nimmer & Nimmer, supra, § 14.02[C][1], at 14-31 to -34.

-21-

local rate, like the award itself, was within the sound discretion of the district judge.  E.g., <u>Colon Velez</u> v. <u>P.R. Marine Mgmt., Inc.</u>, 957 F.2d 933, 941 (1st Cir. 1992).  Five percent is by historical standards hardly exorbitant.

The last issue is attorneys' fees.  Ordinarily, the prevailing party in a copyright case can be awarded fees "[e]xcept as otherwise provided by" the statute.  17 U.S.C. § 505.  Here, such an award was barred by statute because the copyright for the scripts was not registered in a timely fashion.  <u>Id.</u> § 412; <u>see, e.g.</u>, <u>Knitwaves, Inc.</u> v. <u>Lollytogs Ltd.</u>, 71 F.3d 996, 1012 (2d Cir. 1995) (vacating fee award).  TMTV does not dispute that the statute barred such a recovery on TMTV's own claims against the defendants.

Instead, TMTV argues that it was <u>also</u> the prevailing party as to Logroño's counterclaim, and so entitled to recover its attorneys' fees attributable to defending against this claim.  The argument--unpromising in any event--is forfeit, <u>Dillon</u> v. <u>Select Portfolio Servicing</u>, 630 F.3d 75, 80 (1st Cir. 2011), having first been made in a motion for reconsideration of the district court's denial of TMTV's request for attorneys' fees.

The district court's judgment is <u>affirmed</u>.  Each side is to bear its own costs on these cross-appeals.

<u>It is so ordered</u>.